UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

IN RE:

RICHARD B. PEARL                                             CASE NO. 16-20305

DEBTOR

RICHARD FELDMAN, *individually and as*                         PLAINTIFF
*Assignee of claims by RIVERFRONT DIET*
*CLINIC, INC.*

V.                                                          ADV. NO. 16-2006

RICK PEARL                                                     DEFENDANT

## <u>MEMORANDUM OPINION</u>

This unfortunate dispute involves two cousins and longtime close friends who owned a business together.   When their business failed, their relationship splintered among accusations of misconduct, and litigation in multiple venues ensued.   Ultimately, this Court held a trial on the merits of the claims that Plaintiff asserted against Debtor/Defendant relating to funds disbursed from the business; specifically, a loan made to Plaintiff and a disparity in distributions from the business to the parties.

Debtor Richard B. Pearl filed a chapter 13 petition on March 11, 2016.   He listed Plaintiff Richard Feldman and their co-owned business, Riverfront Diet Clinic, Inc. ("RDC"), as creditors.   Plaintiff filed three proofs of claim in the bankruptcy case.   Claim 9, filed on behalf of Plaintiff personally, asserts an unsecured debt owed for fraud totaling $50,000.00.   Claim 10, filed by Plaintiff as "Assignee of Riverfront Diet Clinic, Inc., in dissolution," seeks to recover an unsecured debt owed to RDC totaling $283,821.77 for "Fraud and/or unauthorized withdrawals

from RDC."[1]   Claim 11, also filed on behalf of Plaintiff personally, asserts an unsecured debt

totaling $188,607.25 owed for "Fraud and/or unauthorized withdrawals from RDC," *i.e.*, for

about two-thirds of the debt allegedly owed to RDC.   Debtor objected to all three claims.

Plaintiff filed the Complaint initiating this proceeding on July 18, 2016.   He asks this

Court to find that Debtor owes debts to Plaintiff and RDC that should be excepted from Debtor's

discharge under § 523(a)(2), (4) and (6).[2]   Debtor filed an Answer to the Complaint and asserted

counterclaims, which the Court dismissed upon Plaintiff's motion.   *Feldman v. Pearl (In re*

*Pearl),* AP Case No. 16-2006, 2017 Bankr. LEXIS 616 (Bankr. E.D. Ky. Mar. 8, 2017).

The parties appeared for trial on Plaintiff's claims on July 25, 2017.   Plaintiff,

represented by counsel, called three live witnesses: (i) himself; (ii) Debtor; and (iii) Rex

Leatherwood, Esq., an attorney with business and legal ties to Plaintiff and his wholly-owned

business.   Without objection, Plaintiff also introduced into evidence prior testimony given by

Debtor at a deposition and at his Rule 2004 examination, as well as the deposition testimony of

two witnesses residing in Tennessee beyond the Court's subpoena power: (i) Shawn Sirgo, Esq.,

another attorney connected to Plaintiff and his wholly-owned business, as well as to debtor, and

(ii) Larrice Carter, CPA, an accountant working for Plaintiff and his wholly-owned business.

Debtor, also represented by counsel, called Pamela Gross, the bookkeeper and tax preparer for

Debtor and RDC.   No experts testified at trial.   Post-trial, each party tendered proposed findings

of fact and conclusions of law.

---

[1] Plaintiff introduced into evidence an assignment agreement between RDC and Plaintiff dated July 15, 2015, which
states that RDC "hereby sells, transfers, and assigns to [Plaintiff], the Assignee … any and all claims, demands, and
cause or causes of action of any kind whatsoever which the undersigned corporation has or may have against Rickie
Pearl, or any other business entity or individual."   [ECF No. 57-22.]

[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

## FINDINGS OF FACT

### I.    Early history.

Plaintiff Richard Feldman and Debtor Richard Pearl are second cousins.   They grew up together and were very close as youths—Plaintiff testified that they were best friends—even seeing a Beatles concert together in happier days.   Both men ultimately assumed careers in the diet clinic business, including through ownership of RDC, a Kentucky corporation operating in Covington, Kentucky.   Plaintiff, a medical doctor, also has provided operating assistance to many other diet clinics in multiple states through a wholly-owned Tennessee business, Doctors' Diet, Inc. ("DDI").   He owns interests in two other clinics, but Plaintiff does not own a stake in the vast majority of the clinics to which DDI provides services.

Debtor, a Kentucky citizen, formed RDC in April 1996.   Its original owners were Debtor, Plaintiff, and non-party Kevin Henderson.   In the late 1990s, Plaintiff conveyed his interest in RDC to Henderson to settle a dispute, leaving Henderson and Debtor as RDC's only shareholders until February 2010.   Debtor was listed as RDC's President on all of RDC's annual reports filed between 1997 and 2012.   RDC has been inactive and in bad standing with the Kentucky Secretary of State since its administrative dissolution in September 2013.   RDC ceased operations in the fall of 2014.

### II.    After RDC experiences business troubles, Plaintiff rejoins RDC.

Beginning in late 2009 or early 2010, RDC had a dispute with a physician that hurt its financial position and jeopardized its future.   The physician, who had been affiliated with RDC, took patient files to form a competing business.   Debtor was suffering from serious health issues at the time and called his cousin for help because of his experience with weight loss clinics and with RDC.   Plaintiff agreed to assist.   In February 2010, he and others associated with DDI

3

came to Covington to stabilize RDC's affairs, including that DDI loaned funds to RDC. Plaintiff referred to these DDI loans as "my loans" at trial.

When Plaintiff returned to assist, Henderson, Debtor and Plaintiff entered into a new ownership arrangement under which each owned one-third of RDC.   Plaintiff also became RDC's Treasurer.   While Debtor continued to operate RDC on a day-to-day basis, Plaintiff became intimately involved in advertising, staffing, and other RDC business matters.   Plaintiff and Debtor were in frequent contact, sometimes speaking multiple times in a day, and Plaintiff obtained updates from Debtor on RDC's day-to-day financial performance on request.

Upon Plaintiff's return to RDC, Plaintiff and Debtor agreed that Debtor would receive a salary of $1,000.00 per week as RDC's principal operator.   They further agreed that distributions to the two from RDC above that salary would be equal.   Plaintiff posits that Debtor took a highly uneven amount of draws from RDC in violation of this agreement—which was not memorialized in a writing signed by Debtor, Plaintiff, Henderson, or anyone on RDC's behalf. Neither party explained Henderson's position on this distribution arrangement, or stated whether Henderson also was to receive distributions.   Henderson did not participate in the trial.

Also upon Plaintiff's return, DDI began to provide goods and management services to RDC.   Unlike DDI's relationships with other diet clinics, DDI and RDC did not have a written contract pursuant to which DDI would deliver its services in exchange for six percent of RDC's gross revenues.   Nevertheless, Plaintiff and Debtor, who together owned two-thirds of RDC at the time, agreed that DDI would receive six percent of RDC's gross revenues as a fee for its services.   RDC also would pay DDI for certain specific goods.   For example, RDC bought folders from DDI containing information on the diet program, which RDC gave to customers.

4

About three years after Plaintiff rejoined RDC, he acquired Henderson's stock, leaving the two cousins as the sole co-owners of RDC.  RDC's By-laws dated March 2013 listed Debtor as RDC's President, Debtor's wife, Elaine, as RDC's Secretary, and Plaintiff as RDC's Treasurer.[3]  As of the trial, Plaintiff owned two-thirds of RDC's stock and Debtor owned the remaining third.

**III.    Facts relating to Plaintiff's two claims against Debtor.**

**A.    Plaintiff's $50,000.00 loan.**

Although Plaintiff became RDC's Treasurer in February 2010, Debtor kept control over its checkbook and he directed payments for the business.  At some point between Plaintiff's return to RDC and May 11, 2010—Plaintiff did not establish the specific date at trial despite its significance to his claim—Plaintiff orally asked Debtor to cause RDC to loan him $50,000.00. Plaintiff did not offer a business purpose for the loan, or explain why he wanted a loan from RDC, a diet clinic (not a bank) which Plaintiff testified was in financial trouble.

Debtor told Plaintiff that RDC did not have the funds to make the loan, but that Debtor would loan him the requested $50,000.00.  Plaintiff accepted Debtor's offer.  No written agreement exists with respect to this loan.

In the same general time frame, Debtor was in the midst of a separate dispute with Henderson (then a RDC co-shareholder) and Debtor wanted to protect his money.  On April 20, 2010, Debtor and his spouse had a personal joint checking account with a balance of $82,829.04. On April 22, Debtor deposited a $50,000.00 check from RDC into the personal account, leaving

---

[3] Elaine was neither a RDC employee nor active in its affairs.

5

RDC with about $18,000.00 in its account.   Then, on April 27, Debtor sent $132,000.00 from

the personal account to Nashville attorney Shawn Sirgo.   Sirgo served for a time as DDI's

corporate counsel, represented Plaintiff individually in certain matters, and knew Debtor due to

Sirgo's involvement in RDC's rescue in February 2010.   Sirgo deposited Debtor's funds into his

business account, leaving a balance of $1,220.43 in Debtor's personal account.

On May 11, 2010, Sirgo received an email from Debtor authorizing the loan to Plaintiff.

Sirgo then wrote a $50,000.00 check to Plaintiff from his business account on that same date,

with the check's memo line stating "Loan From Rick Pearl."   Sirgo understood that Debtor was

making a personal loan to Plaintiff because Plaintiff "was requesting sums of money for his

daughter's wedding and for other personal things."   [ECF No. 70-1 at 13.]

Nearly two years later, on May 8, 2012, through Sirgo, Debtor inquired about Plaintiff's

repayment of the loan.   In July 2012, Plaintiff withdrew $40,000.00 from his personal account

and sent it to Debtor.   DDI—Plaintiff's wholly-owned entity—also sent a $10,000.00 check to

Debtor that month.   Plaintiff testified that he took a $10,000.00 loan from DDI to pay Debtor

back, but offered no documents proving that he and DDI treated this as a loan.   Plaintiff also

testified that DDI's money "is my money" because he is its sole owner.   Debtor accepted these

payments in full satisfaction of the loan; in other words, Plaintiff paid no interest in exchange for

the use of the $50,000.00 for over two years.

### B.      Disbursements from RDC.

Plaintiff also contends that Debtor surreptitiously took disproportionate draws from RDC.

According to Plaintiff, he received only four distributions totaling $86,028.97 from RDC

between February 17, 2010, and June 6, 2014.   In contrast, Debtor either received from RDC, or

had RDC send on his behalf, 24 checks totaling $369,850.74 between January 8, 2010, and June

6, 2014.[4]    Plaintiff asserts that this constitutes embezzlement from RDC.

For support, Plaintiff introduced deposition testimony from Larrice Carter, CPA.    Carter,

a former revenue agent for the Internal Revenue Service, began working as an accountant for

Plaintiff and DDI in 2012.    Plaintiff asked Carter to examine RDC's books in or around the end

of 2014 or beginning of 2015.    Carter obtained RDC's financial and payroll records from or

with the help of RDC's bookkeeper and tax preparer, Pamela Gross.    Initially, Plaintiff asked

Carter to investigate the amounts paid to Gross.    Reviewing the records, however, Carter

concluded that, even setting aside Debtor's $1,000.00 weekly salary, the amounts paid to Debtor

were substantially greater than the amounts paid to Plaintiff.    Plaintiff introduced into evidence

a summary that Carter compiled comparing RDC distributions to Plaintiff and Debtor, along with

back-up documentation.    [ECF Nos. 57-23 through 26.][5]

According to Carter's summary, between February 2010 and RDC's closure in 2014 (and

excluding Debtor's salary), Debtor received $369,850.74 from RDC while Plaintiff received

$86,028.97, a difference of $283,821.77.[6]    In his post-trial proposed findings of fact and

conclusions of law, Plaintiff adjusted the amount Debtor allegedly received in this time frame

down to $352,850.74.    [ECF No. 81 at ¶ 55.]    Debtor also established at trial that Plaintiff

received an additional check for $12,500.00 that is not reflected on Carter's summary.    Using

---

[4] This tally includes $7,000.00 that RDC sent to the Internal Revenue Service on Debtor's behalf before Plaintiff
rejoined RDC.

[5] Carter also created, and Plaintiff introduced, an exhibit depicting her analysis of improper credit card usage by
Debtor and his wife.    [ECF No. 57-27.]    The Complaint, however, does not demand relief from Debtor in
connection with the use of the credit card.    [ECF No. 1.]    Plaintiff's three proofs of claim also do not reference
these allegedly inappropriate personal expenses that Debtor charged to RDC.

[6] This amount includes the $50,000.00 Pearl obtained from RDC on April 22, 2010, discussed in connection with
Count 1 above.

these adjusted figures, Debtor received $352,850.74 from RDC and Plaintiff received

$98,528.97, a difference of $254,321.77.

Debtor contests Plaintiff's view of the facts.   Debtor does not disagree that, consistent

with Carter's review, RDC records (including checks and tax returns) reflect that he, personally,

received more funds from RDC than Plaintiff, personally, did.   In turn, Plaintiff admits that, on

at least a few occasions, when Debtor made a withdrawal or took a distribution from RDC, he

caused a similar distribution to be made to Plaintiff.   Where the parties disagree is on the import

of payments RDC made to DDI.

The parties stipulated that DDI, "a corporation owned by [Plaintiff], actually provided

goods and services to RDC during the period of 2010 through 2014.   [DDI] charged 6% of the

gross revenues of RDC as its fee for the services provided."   [ECF No. 65 ¶ 69.]   As noted

above, no written contract memorializes the terms of this relationship.   Neither party established

the date on which the agreement commenced in 2010 or the date on which it ended in 2014, nor

did either calculate six percent of RDC's gross sales in that specific time frame.   But the parties

did stipulate to the amounts RDC reported as gross income on its tax returns from 2010 through

2014, which permits a calculation of six percent of RDC's gross income in those years:

| Year | RDC Gross Sales | 6% of RDC Gross Sales |
|------|-----------------|------------------------|
| 2010 | $347,353.00 | $20,841.18 |
| 2011 | 698,116.00 | 41,886.96 |
| 2012 | 618,691.00 | 37,121.46 |
| 2013 | 680,764.00 | 40,845.84 |
| 2014 | 517,794.00 | 31,067.64 |
| Total: | $2,862,718.00 | $171,763.08 |

8

Debtor introduced proof that, from 2010 through 2014, RDC paid DDI $355,678.04.[7]

Thus, between 2010 and 2014, and notwithstanding the absence of a written contract, RDC paid

DDI far more than the total of six percent of RDC's gross sales, and the amount paid to DDI was

comparable to the $352,850.74 that Debtor received in that time frame.   In addition, many

checks to DDI have similar or identical dates as checks to Debtor.

Debtor testified that he attempted to equalize payments made to him and payments made

to Plaintiff by paying compensation to Plaintiff through DDI.   Debtor stated that he "always"

told Pamela Gross that distributions made to him and to Plaintiff had to be equal, and that he also

understood that Plaintiff did not want to receive checks directly from RDC written through its

payroll account.   Debtor also testified that he relied on Gross, his "accountant," to help him with

RDC's finances while he focused on running RDC's clinic.   However, Debtor's admitted and

evident memory issues and his changing positions on why a disparity existed between the

parties' distributions raise significant questions about his testimony.[8]

Debtor also introduced testimony from Pamela Gross about distributions made by RDC.

Through her company, Gross provided bookkeeping and tax preparation services for RDC for a

period of time ending in 2014.[9]   Gross explained that she spoke regularly with both Plaintiff and

---

[7] Defendant introduced a copy of RDC's "Transactions by Account" Quickbooks information for transactions with
DDI.   [ECF No. 58-4.]   While the document reflects payments totaling $355,678.04 from RDC to DDI, it also
reflects $25,000.00 in loans from DDI to RDC and a returned check for $28,614.84.   The net amount DDI received
from 2010 to 2014 was $302,063.20, and this total includes almost $8,000.00 that RDC paid DDI for specific
supplies.

[8] At an unknown point, but prior to end of 2014, Debtor contracted a serious illness.   The medication Debtor takes
for that illness has affected his memory.   His memory problems existed as of his Rule 2004 exam in June 2016 and
his deposition in May 2017, and were evident at trial.

[9] Gross and Debtor executed an engagement letter between RDC and her company on January 11, 2013, but she
provided services to RDC before this time.   Under the engagement letter, RDC was to pay a minimum of $2,915.00
per month for services including monthly bookkeeping, monthly "CFO" services, preparation of corporate and
personal tax returns, and payroll services.   Prior to January 2013, Gross's entity had charged RDC $12,000.00 to

DDI professionals, and that she sometimes joined the telephone calls involving Plaintiff and Debtor and often others at DDI.   She testified that Will Sullivan, an in-house accountant for DDI, instructed her not to have Plaintiff's draws or distributions paid through RDC payroll, as it apparently created a problem with Plaintiff's "Social Security."   She also testified that she did not have a clear understanding of how draws for Debtor and Plaintiff would be taken, but "if [Debtor] said 'I would take a check for $10,000.00,' [Plaintiff] would be on the phone and it would be checks to both."   Moreover, she stated that RDC regularly wrote checks to Plaintiff and DDI that were "outside" of DDI's six percent fee.   She explained that, even though she was not on every call that Debtor and Plaintiff had with each other, she "knew" that whenever Debtor cut himself a check he had spoken with Plaintiff, and that if there was an instruction to her to prepare a check for Debtor, there also would be a check written for Debtor to sign "for" Plaintiff.

## JURISDICTION AND VENUE

This Court has jurisdiction over this adversary proceeding and venue is proper.   28 U.S.C. §§ 1334(b), 1409.   Plaintiff's non-dischargeability claims are core proceedings.   28 U.S.C. § 157(b)(2)(I).   At the pretrial conference, the parties confirmed their consent to the Court's entry of final orders on these claims.

## DISCUSSION

**I.      Claims Under § 523(a) Follow a Two-Step Framework.**

Section 523(a) of the Bankruptcy Code contains several categories of non-dischargeable debt.   To succeed on a claim made under a subsection of § 523(a), a plaintiff must prove by a

---

$13,000.00 per year for its services.   Gross explained that the new contractual arrangement resulted from the fact that Debtor, owing to his illness, became unable to handle certain job duties that he previously had performed.

preponderance of the evidence each requisite element to support the determination that a specific

debt is non-dischargeable under those subsections.   *Merritt v. Layne (In re Layne)*, 517 B.R.

778, 781 (Bankr. E.D. Ky. 2014).   "Exceptions to discharge are narrowly construed in the

debtor's favor."   *HIJ Indus. v. Roy (In re Roy)*, 565 B.R. 820, 830 (Bankr. E.D. Ky. 2017)

(citing *In re Zwosta*, 395 B.R. 378, 382-83 (B.A.P. 6th Cir. 2008)).

The first step in any analysis under § 523(a), however, is not whether a debt is non-

dischargeable, it is whether a debt even exists—a "threshold condition" to whether § 523(a)

applies.   *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998).   "A 'debt' is defined in the Code as

'liability on a claim,' a 'claim' is defined in turn as a 'right to payment,' and a 'right to

payment,' we have said, 'is nothing more nor less than an enforceable obligation.'"   *Id*.

(citations omitted).   Whether a valid claim exists must be determined in accordance with state

law *before* a bankruptcy court decides whether, under federal law, the debt is non-dischargeable:

> At the outset, we distinguish between the standard of proof that a creditor must
> satisfy in order to establish a valid claim against a bankrupt estate and the
> standard that a creditor who has established a valid claim must still satisfy in
> order to avoid dischargeability.   The validity of a creditor's claim is determined
> by rules of state law.   Since 1970, however, the issue of nondischargeability has
> been a matter of federal law governed by the terms of the Bankruptcy Code.

*Grogan v. Garner*, 498 U.S. 279, 283-84 (1991) (citations omitted); *see also Walker v.

Vanwinkle (In re Vanwinkle)*, 562 B.R. 671, 677 (Bankr. E.D. Ky. 2016) ("The § 523(a)(2)(A)

analysis is a two-step process: (1) determine the validity of the debt; and (2) determine whether

the debt is non-dischargeable under the statute." (citing *Hatfield v. Thompson (In re Thompson)*,

555 B.R. 1, 8 & n.39 (B.A.P. 10th Cir. 2016))).

The analyses needed to decide Plaintiff's claims are not straightforward.   In part, this is

because of the varying capacities under which Plaintiff pursues the claims.   Plaintiff also created

11

confusion by not following the aforementioned two-step process.    Further, complications arise

because Plaintiff ignores the distinction between himself and the corporate entities involved.

The combined effect of these issues requires the Court to add precision to Plaintiff's claims that

otherwise is lacking.

## II.    Plaintiff is not Entitled to Relief Under Count 1 Regarding the $50,000.00 Loan.

The repaid $50,000.00 loan serves as the basis for Count I.    Plaintiff asserts that Debtor

committed common law fraud in connection therewith.    Plaintiff claims generally that Debtor

took funds from RDC and loaned those funds to Plaintiff and, had Plaintiff known this, he would

not have sent $50,000.00 to Debtor in July 2012.    When Debtor filed his bankruptcy petition,

Debtor and Plaintiff were litigating Plaintiff's fraud claim against Debtor pertaining to this loan

in Tennessee state court.

To adjudicate Count 1, it is imperative that the capacity in which Plaintiff claims a right

to relief on this cause of action and the basis for the alleged debt is clear.    Specifically, in Count

1, Plaintiff *does not* assert liability against Debtor *on RDC's behalf* for a purported improper

withdrawal of $50,000.00 from RDC in April 2010.    Rather, Plaintiff asserts that Debtor owes

Plaintiff, *in his personal capacity*, a $50,000.00 debt because Plaintiff repaid $50,000.00 to

Debtor in 2012 when, instead, Plaintiff should have repaid that money (if at all) to RDC.[10]

_____

[10] The Complaint alleges: "[Plaintiff] was damaged by the fraudulent acts of [Debtor]; but for the fraud, [Plaintiff] would have repaid the $50,000.00 to [RDC], a corporation in which he owned two-thirds (⅔) of the stock, *or he would have offset the balance against the unauthorized distributions made to [Debtor]*."    [ECF No. 1 ¶ 23 (emphasis added).]    In other words, Plaintiff alleges that *he may not have paid any funds to RDC at all* even if, as he alleges, the funds loaned to him were RDC's funds.    In this way, Plaintiff conflates what is RDC's money with his personal interest in RDC.    Plaintiff may not borrow, take, or withhold RDC's money, or otherwise deal with it as if it is his own, just because he owns RDC stock.    *See, e.g., Ferrara v. Oakfield Leasing, Inc.*, 904 F. Supp. 2d 249, 268 (E.D.N.Y. 2012) (stating that a shareholder improperly used a corporation "as his 'personal piggy bank', in that he used corporate funds for personal rather than corporate purposes" and thereby exhibited a "lack of respect for the corporate form")).

**A.    The Complaint asks the Court to determine that a debt exists based on fraud, but it does not plead a clear state law cause of action for fraud upon which the Court should find that a debt exists.**

The Tennessee state court did not decide Plaintiff's fraud claim against Debtor before Debtor filed his bankruptcy petition.   Hence, Plaintiff had not reduced his claim to a judgment in that case—and did not establish a debt exists—before Plaintiff started this action.

The Complaint appears to acknowledge the principle that, to succeed on a non-dischargeability claim under § 523(a), Plaintiff first must establish the existence of a debt. Count 1 of the Complaint seeks "a judgment on [a] fraud claim" and "$50,000.00, plus prejudgment interest, for the fraud perpetrated upon Feldman concerning the requested loan." [ECF No. 1 p.4 ¶ 25, p.5 ¶ 1.]   The Complaint also seeks an Order "excepting the aforementioned debt[] from discharge."   [*Id.*, p.5 ¶ 3.]

The Complaint, however, does not clearly allege a common law fraud claim against Debtor for $50,000.00 under state law.   Instead, in Count 1 the Complaint tracks the elements that must be proven for a debt to be deemed non-dischargeable under § 523(a)(2)(A).   Because this issue was not raised on a motion to dismiss and the parties participated in a trial, and reading the Complaint charitably in Plaintiff's favor, the Court will construe Count 1 to assert a claim for $50,000.00 arising from common law fraud under state law.

**B.    Kentucky substantive law applies.**

The next question is which state's substantive law should be applied for purposes of establishing the validity of the alleged debt.   Bankruptcy courts are federal courts, and federal courts apply state law to substantive state law questions.   *Compliance Marine, Inc. v. Campbell (In re Merritt Dredging Co.),* 839 F.2d 203, 205 (4th Cir. 1988).   To determine which state's law applies, federal courts in Kentucky use Kentucky choice of law rules.   *State Farm Mut.*

*Auto. Ins. Co. v. Norcold, Inc.*, 849 F.3d 328, 331 (6th Cir. 2017) ("As a federal court exercising diversity jurisdiction, the choice-of-law rules of the forum state, Kentucky, determine what substantive law to apply."); *Menuskin v. Williams*, 145 F.3d 755, 761 (6th Cir. 1998) ("A federal court exercising supplemental jurisdiction is bound to apply the law of the forum state, including its choice of law rules.").

Common law fraud is a tort claim. *Imaging Fin. Servs., Inc. v. Lettergraphics/Detroit, Inc.*, No. 97-1930, 1999 U.S. App. LEXIS 2405, at *8 (6th Cir. Feb. 9, 1999) (table decision). Kentucky choice of law rules provide that Kentucky law will apply to tort claims so long as there are "significant contacts" with Kentucky. *Aces High Coal Sales, Inc. v. Cmty. Trust & Bank*, Civil Action No. 15-161-DLB-HAI, 2017 U.S. Dist. LEXIS 113639, at *39 (E.D. Ky. July 21, 2017) (citing *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972)).   Debtor is a Kentucky citizen. He made purported misrepresentations and engaged in questioned financial transactions in Kentucky.   His alleged wrongful conduct concerns the operations of and funds belonging to a Kentucky corporation, RDC.   Thus, the Court will apply Kentucky law to Plaintiff's state law tort claim owing to these significant contacts with Kentucky.

Under Kentucky law, a claimant must establish six elements to prove a common law fraud claim: "(a) a material misrepresentation, (b) which is false, (c) known to be false or made recklessly, (d) made with inducement to be acted upon, (e) acted in reliance thereon, and (f) causing injury." *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999) (citation omitted).[11]   "A material misrepresentation is defined as 'substantial inaccuracies of the

---

[11] Kentucky has a five-year statute of limitations for fraud after the cause of action accrued, which begins to run when the plaintiff discovers fraud.   KY. REV. STAT. § 413.120(3), (11); *Gresh v. Waste Services of America, Inc.*, 311 Fed. Appx. 766, 774-75 (6th Cir. 2009).   Defendant asserted that, under Tennessee law, the statute of

type which would generally affect a [creditor's] decision.'" *Central Bank & Trust Co. v.*

*Mustafa (In re Mustafa)*, 557 B.R. 533, 539 (Bankr. E.D. Ky. 2016) (citations omitted).   "A

plaintiff is required to prove fraud by clear and convincing evidence, a heightened standard of

proof."  *Norwich v. Norwich*, 459 S.W.3d 889, 899 (Ky. 2015) (citation omitted).   "Where the

proven facts or circumstances merely show inferences, conjecture, or suspicion, or such as to

leave reasonably prudent minds in doubt, it must be regarded as a failure of proof to establish

fraud."  *Bates v. Alliance Banking Co.*, No. 2016-CA-000410-MR, 2017 Ky. App. Unpub.

LEXIS 572, at *15 (Ky. Ct. App. Aug. 4, 2017) (citing *Goerter v. Shapiro*, 72 S.W.2d 444, 445-

46 (Ky. 1934)).

### C.    Plaintiff did not carry his burden to prove that Debtor committed common law fraud to establish the existence of a debt.

Plaintiff did not establish by clear and convincing evidence the existence of a $50,000.00

debt owed by Debtor to Plaintiff arising from common law fraud under Kentucky law.   In fact,

Plaintiff lacked a cogent and viable legal theory with respect to this claim.   Primarily, Plaintiff

did not prove that he suffered an injury, a glaring problem with Plaintiff's position.

Under Kentucky law, a fraud victim is entitled to compensation for injuries that are the

natural and proximate result of the fraud.  *Miller's Bottled Gas, Inc. v. Borg-Warner Corp.*, 56

F.3d 726, 735 (6th Cir. 1995).   Long ago, Kentucky's highest court adopted the Restatement's

view with respect to the measure of damages available to a fraud victim:

> In Restatement of the Law of Torts, Volume 3, Section 549, page 108, the rule is
> stated as follows:
>
> > "The measure of damages which the recipient of a fraudulent
> > misrepresentation is entitled to recover from its maker as damages * * * is

---

limitations bars this claim.   Based on the facts presented at trial and Kentucky law, the Court finds that the statute
of limitations does not bar Count 1.

the pecuniary loss which results from the falsity of the matter misrepresented, including

"(a) the difference between the value of the thing bought, sold or exchanged and its purchase price or the value of the thing exchanged for it, and

*"(b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the truth of the representation."*

*Sanders, Inc. v. Chesmotel Lodge, Inc.*, 300 S.W.2d 239, 241 (Ky. 1957) (emphasis added).

The evidence presented at trial established that Plaintiff accepted a $50,000.00 loan from Debtor, and then he and DDI repaid Debtor that $50,000.00.[12]   Plaintiff argues that, had he known Debtor had obtained $50,000.00 from RDC and then loaned those funds to Plaintiff (which he also did not prove, as noted below), Plaintiff would not have repaid Debtor the $50,000.00.   But repaying a debt actually incurred does not create an injury.   If Debtor wrongfully took $50,000.00 from RDC and loaned those funds to Plaintiff, *then RDC suffered the injury when Debtor took its funds.*[13]   The fact that Plaintiff owns an interest in RDC, or claims a right to offset based on Debtor's allegedly wrongful distributions from RDC, does not mean that Plaintiff suffered an actual pecuniary loss when he repaid a debt.   Repaying Debtor the exact sum Plaintiff borrowed for over two years, interest free, simply did not cause Plaintiff any cognizable injury.

---

[12] The Court largely accepts Plaintiff's testimony and Sirgo's testimony with regard to the facts underlying how the loan came to pass.   Debtor's testimony on the subject was unreliable.   Debtor posited in the Tennessee case that he did not recall the transaction, but did remember demanding that Plaintiff repay him.   At his Rule 2004 exam (the transcript of which was admitted as evidence at trial), Debtor did not recall the circumstances of the $50,000.00 transfer to Plaintiff or its repayment in 2012.   At trial, Plaintiff exhibited confusion and a lack of recollection about the circumstances surrounding the loan, including that he did not recall authorizing Sirgo to send funds to Plaintiff.

[13] As stated above, Plaintiff, the assignee of all of RDC's claims against Debtor, did not assert and pursue a claim for relief in this case based on the theory that Debtor wrongfully took $50,000.00 from RDC on April 22, 2010.

The Court also finds that the evidence presented did not show by clear and convincing evidence that Debtor made an intentional material misrepresentation to Plaintiff.    First, Plaintiff did not prove that the "source" of the funds Debtor loaned to Plaintiff was material.    Plaintiff wanted a $50,000.00 interest-free loan and Debtor gave him one.    Debtor sent Sirgo more than sufficient funds to cover this loan even if Debtor had not withdrawn $50,000.00 from RDC in April 2010.    Next, because Plaintiff did not establish the date on which he requested the loan, he also did not prove that RDC even had $50,000.00 to loan to him when he asked Debtor to cause RDC to make a loan.    Further, Plaintiff did not prove that RDC, even if it had more than $50,000.00 in its account when Plaintiff asked for a loan, was in any position to lend an interest-free $50,000.00 to Plaintiff without a business purpose shortly after RDC had, by all accounts, been in severe financial jeopardy.

For all of these reasons, Plaintiff failed to prove an enforceable $50,000.00 fraud claim against Debtor by clear and convincing evidence.[14]

> **D.    Even if Plaintiff had proven the existence of a $50,000.00 debt, Plaintiff failed to carry his burden to demonstrate an entitlement to relief based on actual fraud under § 523(a)(2).**

Even if Plaintiff had established an enforceable common law fraud claim, he is not entitled to relief under § 523(a)(2)(A) which excepts a claim "obtained by … false pretenses, a false representation, or actual fraud" from a debtor's discharge.    A claimant seeking relief under § 523(a)(2)(A) carries the burden to prove by a preponderance of the evidence

---

[14]  At the close of Plaintiff's proof, Debtor moved for judgment as a matter of law on Count 1 with respect to the $50,000.00 loan as Plaintiff had not established that he, personally, had incurred any damages.    Debtor argued that RDC, and not Plaintiff, would have suffered any injury related to Debtor's conduct at issue in Count 1.    The Court took that motion under submission and now agrees with Debtor for the reasons outlined herein.

that the debtor obtained money through a material misrepresentation that at the
time the debtor knew was false or made with gross recklessness as to its truth.
The creditor must also prove the debtor's intent to deceive.    Moreover, the
creditor must prove that it reasonably relied on the false representation and that its
reliance was the proximate cause of loss.

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996) (quoting *Atassi v.*

*McLaren (In re McLaren)*, 990 F.2d 850, 852 (6th Cir. 1993)).    The evidence does not support

that Plaintiff established a right to relief under this standard because, for the reasons stated

above, Plaintiff did not suffer any direct loss or injury when he and DDI repaid the $50,000.00

that he alone borrowed for two years with no interest, nor did Plaintiff establish that Debtor

intended to deceive him when Debtor made the loan.

III.    **Count 2 - Plaintiff Failed to Carry his Burden to Demonstrate an Entitlement to
Relief under § 523(a)(2), (4) or (6) for Unauthorized Withdrawals from RDC.**

Plaintiff bases his claim in Count 2 upon the premise that the Court should compare only

the checks from RDC specifically written to Plaintiff with the amounts Debtor received from

RDC.    Plaintiff claims that the amount of disproportionate draws Debtor took should be deemed

non-dischargeable.    As with Count 1, to succeed under Count 2, Plaintiff first must establish that

Debtor owes a debt.    Plaintiff did not prove that any such debt exists.

A.    **Plaintiff did not prove that Debtor owes a debt based on common law fraud
in connection with the alleged disparity in distributions that can be deemed
non-dischargeable based on § 523(a)(2)(A).**

In Count 2, the Complaint states that Plaintiff seeks relief under § 523(a)(2)(A) based on

fraud that Debtor allegedly committed against RDC or against Plaintiff in connection with

"unauthorized withdrawals [which] totaled approximately $283,821.77."    [ECF No. 1 ¶¶ 30, 33,

34.]    The Complaint avers that Plaintiff, "individually or as assignee of RFC, is entitled to an

Order of the Court excepting these withdrawals from discharge."    [*Id.* ¶ 34.]    As with Count 1,

18

Count 2 does not plead a claim for relief under state or other non-bankruptcy law to establish the existence of a debt related to the unauthorized withdrawals.

Setting this pleading deficiency aside, the Court finds that Plaintiff failed to prove a fraud claim against Debtor at trial under Kentucky law on behalf of himself or RDC related to unauthorized withdrawals.   While Plaintiff introduced evidence about the payments made to or on behalf of Debtor, and compared the sum of those payments with the total of payments made to Plaintiff, personally, Plaintiff made no effort to prove at trial how such alleged disparity constituted fraud on either Plaintiff or RDC.   Indeed, Plaintiff's post-trial proposed findings of fact and conclusions of law do not even attempt to explain how Plaintiff committed common law fraud with respect to the disparity of withdrawals.   Any claim under § 523(a)(2)(A) fails.

**B.      Plaintiff did not establish that Debtor owes a debt based on conversion in connection with the alleged disparity in distributions, and thus may not pursue a non-dischargeability claim via Count 2 under § 523(a)(4).**

Plaintiff also seeks relief under § 523(a)(4) in Count 2.   A debt is non-dischargeable under § 523(a)(4) if it is incurred by (a) fraud or defalcation while acting in a fiduciary capacity, (b) larceny, or (c) embezzlement.   Resolving two preliminary matters will clarify the inquiry with respect to Count 2.

First, and just as with Count 1, to adjudicate Count 2, it is vital that the capacity in which Plaintiff claims a right to relief on this cause of action and the basis for the alleged debt is clear. Specifically, in Count 2, Plaintiff *does not* assert liability against Debtor *on his own behalf* owing to Debtor's allegedly unbalanced distribution of RDC's funds in violation of the parties' oral agreement.   Rather, in Count 2, Plaintiff asserts that Debtor owes Plaintiff, *as the assignee of*

19

*RDC's claims against Debtor*, a $283,821.77 debt because Debtor allegedly distributed that much more to himself from RDC than to Plaintiff.[15]

Second, although the Complaint references Debtor's "fiduciary duties," the Complaint does not use the word larceny.   More importantly, neither the evidence nor Plaintiff's post-trial proposed findings of fact and conclusions of law provide either evidentiary or legal support for the proposition that Plaintiff committed either fraud or defalcation while acting in a fiduciary capacity, or larceny, with respect to the allegedly disparate distributions.   Therefore, the Court considers only whether Plaintiff established that Debtor committed embezzlement.

### 1.    Plaintiff failed to prove the existence of a debt subject to Section 523(a)(4).

A claim under § 523(a)(4) has the same fundamental prerequisite as a claim under § 523(a)(2)(A): the existence of a debt.   "Whether a plaintiff has standing to object to the dischargeability of a debt is, of course, based on whether that party has a debt to object to.   In bankruptcy, whether there is a debt is a question of state law."   *Allen v. Scott (In re Scott)*, 481 B.R. 119, 138 (Bankr. N.D. Ala. 2012) (emphasis in original).

Similar to Count 1, Count 2 of the Complaint conflates the two-step process required to address a § 523(a) claim.   Plaintiff failed to plead any cause of action under state (or other non-

---

[15] The Complaint alleges: "In the alternative, Feldman, in his own right as owner of two-thirds (⅔) of the stock of RFC, is entitled to a judgment against Pearl for two-thirds (⅔) of the amount of improper withdrawals."   [ECF No. 1 ¶ 28.]   Thus, Plaintiff's asserted standing under Count 2 is not on the basis of harm he allegedly incurred *personally*, but rather harm he suffered *derivatively* based on his interest in RDC.   As this Court stated when dismissing Debtor's counterclaims, "'[c]orporate assets are the property of the corporation, not the shareholders'" and "'if corporate assets are misappropriated … it is an injury to the corporation, not a shareholder.'"   *Feldman v. Pearl (In re Pearl)*, *supra*, 2017 Bankr. LEXIS 616, at *22 (citing *Gross v. Adcomm, Inc.*, 478 S.W.3d 396, 400 (Ky. Ct. App. 2015)).   This comports with the absence in Plaintiff's findings of fact and conclusions of law of any argument that Debtor personally owes Plaintiff a debt in connection with embezzlement from RDC that should be deemed non-dischargeable.   [ECF No. 81 at pp. 37-38.]

bankruptcy) law pursuant to which Plaintiff asserts a debt exists that would be non-dischargeable

as embezzlement under § 523(a)(4).    Kentucky does not recognize a civil cause of action for

embezzlement.    Based on the Complaint's allegations about unauthorized withdrawals, its use of

the term embezzlement, and the proof Plaintiff offered at trial, the closest civil analogue for

purposes of finding a claim creating a debt under Kentucky law is the tort of conversion.

*Fontaine v. P&J Resources, Inc. (In re P&J Resources Inc.)*, 475 B.R. 838, 862 (Bankr. E.D. Ky.

2012) ("Conversion is a tort involving the 'wrongful exercise of dominion and control over

property of another.'" (quoting *State Auto Mut. Ins. Co. v. Chrysler Credit Corp.*, 792 S.W.2d

626, 627 (Ky. App. 1990))); *see also Panther Petro., LLC v. Couch (In re Couch)*, 544 B.R. 867,

875 (E.D. Ky. 2016) ("The Plaintiffs sought damages for breach of fiduciary duty and

conversion in the state court, which are counts often associated with a § 523(a)(4) action."),

*aff'd*, No. 16-8009, 2017 Bankr. LEXIS 301 (B.A.P. 6th Cir. Feb. 2, 2017).    Plaintiff's findings

of fact and conclusions of law reference the unauthorized withdrawals as "conversion."

> To prove a conversion claim, a plaintiff must show:
>
> (1) the plaintiff had legal title to the converted property; (2) the plaintiff had
> possession of the property or the right to possess it at the time of the conversion;
> (3) the defendant exercised dominion over the property in a manner which denied
> the plaintiff's rights to use and enjoy the property and which was to the
> defendant's own use and beneficial enjoyment; (4) the defendant intended to
> interfere with the plaintiff's possession; (5) the plaintiff made some demand for
> the property's return which the defendant refused; (6) the defendant's act was the
> legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered
> damage by the loss of the property.

*Madison Capital Co., LLC v. S&S Salvage, LLC*, 765 F. Supp. 2d 923, 931-32 (W.D. Ky. 2011)

(citing *Kentucky Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632

n.12 (Ky. 2005)).    "Conversion has also been defined in more succinct terms as 'the deceitful,

intentional appropriation of the money without the right or without belief of right[.]'" *Fontaine*,

475 B.R. at 863 (citations omitted).   In his proposed findings of fact and conclusions of law,

Plaintiff argues that a case from the Bankruptcy Court in the Western District of Kentucky, *Fed.*

*Ins. Co. v. Woods (In re Woods),* 558 B.R. 164 (Bankr. W.D. Ky. 2016), "presented a similar

case as this one."   [ECF No. 81 at 27.]   In *Woods,* the debtor admitted to having committed

criminal acts of embezzlement.   Debtor in this case, however, has neither admitted criminal

embezzlement nor been charged with or convicted of any such offense.

The Court finds that Plaintiff did not establish by a preponderance of the evidence that

Debtor deceitfully and intentionally appropriated money from RDC without any right to do so, or

without a belief that he had a right to do so, based on the disparity between the parties'

respective personal distributions from RDC.   The Court further finds that payments made to

DDI must be taken into account when evaluating whether Debtor committed conversion.

While the parties stipulated that it was agreed that DDI would receive six percent of

RDC's gross sales, it is significant to the Court that this arrangement was not memorialized in a

written contract.   According to Leatherwood, DDI had written contracts with respect to the other

clinics with which DDI had relationships—the vast majority of which Plaintiff did not own.

This evidenced that DDI and Plaintiff intentionally chose to create a different relationship with

RDC—an entity owned in part by Debtor, Plaintiff's cousin and childhood best friend—than

with the other clinics.

As noted earlier, although Debtor's admitted memory issues and changing positions

raised questions about his testimony regarding the alleged discrepancy, Gross largely

corroborated it.   The Court found Gross' testimony to be credible and vastly more believable the

Plaintiff's testimony on the import of payments made to DDI.   Debtor and Gross testified at

length about their multiple telephone calls with Plaintiff in which RDC's finances and payments

by RDC would be discussed; while Plaintiff acknowledged having calls with Debtor, he unconvincingly downplayed their significance and content.   Debtor and Gross also credibly explained why DDI received far more than six percent of RDC's gross revenue in the relevant time frame: Plaintiff wanted to receive funds from RDC this way, rather than as direct payments to him.

While the Court did not find Plaintiff to be credible on this issue, the Court still was strongly influenced by Plaintiff's testimony and conduct in reaching a conclusion on his conversion claim.   Plaintiff convinced the Court that he does not respect the fundamental distinction between a corporate entity and its owners.   Plaintiff, for no justifiable business reason, wanted a corporation operating a struggling diet clinic to loan him $50,000.00, without interest, so that he could pay personal obligations.   Plaintiff testified that DDI's money was "his money" and its loans to RDC were "his loans."   When Plaintiff repaid Debtor for the $50,000.00 loan, he took $10,000.00 from DDI to do so—and Plaintiff failed to prove that he and DDI actually treated this $10,000.00 payment as a loan.   This evidence strongly suggests that the parties understood that RDC's payments to DDI actually were payments to Plaintiff.

In fact, the evidence at trial confirmed that neither Plaintiff nor Debtor observed corporate formalities with respect to RDC.   This fact further convinces the Court that Debtor and Plaintiff would view payments to DDI as payments to its owner, and further undermines the credibility of Plaintiff's position with regard to the import of distributions to DDI.

For these reasons, the Court finds that Debtor's view of the facts presented—that payments to both Plaintiff and DDI must be taken into account when considering Plaintiff's conversion claim—to be more believable than Plaintiff's version.   Plaintiff did not establish any

23

deceitful or intentionally wrongful conduct by Debtor, and therefore Plaintiff did not prove by a

preponderance of the evidence that Debtor owes a debt to RDC based on conversion.

### 2.    Even if Plaintiff had established a debt, he did not establish that RDC is entitled to relief under § 523(a)(4).

For the reasons stated above, the Court finds that Plaintiff did not prove that Debtor owes

a $283,821.77 debt to Plaintiff as the assignee of RDC's conversion claim against Debtor.    Even

if the Court had reached the opposite conclusion, however, the Court would not find that Plaintiff

is entitled to relief under § 523(a)(4), and thereby hold that the debt is non-dischargeable as a

result of embezzlement.    The Sixth Circuit has explained:

> Federal law defines "embezzlement" under section 523(a)(4) as the fraudulent
> appropriation of property by a person to whom such property has been entrusted
> or into whose hands it has lawfully come.    A creditor proves embezzlement by
> showing that he entrusted his property to the debtor, the debtor appropriated the
> property for a use other than that for which it was entrusted, and the
> circumstances indicate fraud.

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996) (citations and internal

quotation marks omitted).    "To succeed on a theory of embezzlement, the Plaintiff must prove

that '(a) the Debtor appropriated funds for his own benefit, and (b) he did so with fraudulent

intent or deceit.    Both the intent and the actual misappropriation necessary to prove

embezzlement may be shown by circumstantial evidence.'"    *Cardwell v. Hester (In re Hester)*,

559 B.R. 472, 477-478 (Bankr. W.D. Ky. 2016) (quoting *In re James*, 42 B.R. 265, 267 (Bankr.

W.D. Ky. 1984)).

Although Plaintiff presented much testimony regarding deficiencies in Debtor's record-

keeping, there was no proof, circumstantial or otherwise, of fraudulent intent or deceit. Weighing

the evidence presented, for the reasons stated above with respect to Plaintiff's failure to prove his

conversion claim, the Court finds that Plaintiff did not establish that Debtor appropriated RDC

funds for his own benefit with fraudulent intent or deceit so as to constitute embezzlement,

resulting in non-dischargeable debt under § 523(a)(4).

### C. Plaintiff did not establish that Debtor owes a debt to RDC resulting from a willful and malicious injury, and thus may not pursue a non-dischargeability claim via Count 2 under § 523(a)(6).

Finally, § 523(a)(6) excepts from discharge "any debt . . . for willful and malicious injury

by the debtor to another entity or to the property of another entity."   11 U.S.C. § 523(a)(6).   To

succeed on this claim, Plaintiff had the burden to prove by a preponderance of the evidence that

Debtor engaged in willful and malicious conduct that resulted in an injury to RDC or its

property.   As the Bankruptcy Appellate Panel for the Sixth Circuit stated:

> To except a debt from discharge under § 523(a)(6), the alleged injury must be
> both willful and malicious.   *Markowitz v. Campbell* (*In re Markowitz*), 190 F.3d
> 455, 463 (6th Cir. 1999).   For a debt to be held willful and malicious as
> contemplated by § 523(a)(6), the act at issue must be done with the actual intent
> to cause injury.   *Id*. at 464.   The requisite intent is present when the debtor
> "'desires to cause [the] consequences of his act, or ... believes that the
> consequences are substantially certain to result from it.'"   *Id*. (citation omitted).
> Section 523(a)(6) requires a debtor to commit an act akin to an intentional, rather
> than negligent or reckless tort.   *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.
> Ct. 974, 977, 140 L.Ed.2d 90 (1998).   An act is "malicious" if it is undertaken "in
> conscious disregard of one'' duties or without just cause or excuse."   *Wheeler v.
> Laudani*, 783 F.2d 610, 615 (6th Cir. 1986).   "Malicious" acts do "not require ill-
> will or specific intent to do harm."   *Id*.   The party seeking to deny debtor a
> discharge bears the burden of proving both requirements by a preponderance of
> the evidence.   *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 661, 112
> L.Ed.2d 755 (1991).

*In re Phillips*, 434 B.R. 475, 483 (B.A.P. 6th Cir. 2010).

As a result, to succeed under § 523(a)(6), Plaintiff had to show that Debtor "actually

intended the injury caused, not merely intended the act that caused the injury."   *Bush v. Roberts

(In re Roberts)*, 452 B.R. 597, 603 (Bankr. W.D. Ky. 2011).   A willful and malicious injury has

not been committed unless the "actor desires to cause consequences of his act, or . . . believes

that the consequences are substantially certain to result from it." *Markowitz*, 190 F.3d at 464.

"[D]ebts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Kawaauhau v. Geiger*, 523 U.S. at 64.

The Court concludes that Plaintiff did not adduce evidence of an intentional and malicious injury that caused any debt owed by Debtor to RDC.   To be sure, Plaintiff put forward proof that Debtor obtained a different amount of funds from RDC than Plaintiff did after Plaintiff returned to RDC, but Plaintiff did not prove that this created a debt owed to RDC.   Further, even assuming that a debt did exist in RDC's favor against Debtor owing to disparate distributions, the fact that a disparity exists, without more, is insufficient to except a debt from discharge under § 523(a)(6).   The evidence presented at trial did not establish that Debtor's uneven disbursements to himself on the one hand, and to DDI and Plaintiff on the other, was done with an actual intent to cause an injury to RDC or to its property.

## CONCLUSION

The foregoing constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.   In reaching the conclusions found herein, the Court has considered all of the parties' stipulations, evidence, exhibits, and arguments of counsel, regardless of whether or not they are referred to specifically in this Memorandum Opinion.

A Judgment in Debtor's favor dismissing Plaintiff's claims with prejudice shall be entered.   As the prevailing party, the Court finds that Debtor is entitled to recover his costs of suit from Plaintiff, which Debtor demanded in his Answer.   Debtor may submit a bill of costs. FED. R. BANKR. P. 7054(b)(1).

26

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



Signed By:
*Tracey N. Wise*
**Bankruptcy Judge**
**Dated: Friday, September 29, 2017**
**(tnw)**